**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES**, <br><br> v. <br><br> **KEONTE WILSON**, <br><br> Defendant. | No. 25-cr-318 (TSC) |

**MEMORANDUM OPINION**

On the evening of August 28, 2025, police approached Defendant Keonte Wilson on a public sidewalk and quickly surrounded him. After speaking with Wilson for over thirty seconds, one officer allegedly observed a bulge in Wilson's groin area; the officer then frisked Wilson and recovered a gun. The Government concedes that police did not have reasonable suspicion to seize Wilson until after the officer observed the bulge. *See* Hr'g Tr. at 94 (Feb. 26, 2026), ECF No. 36. Because police seized Wilson before that alleged observation, the court will GRANT Wilson's Motion to Suppress, ECF No. 24. A separate Order will follow this opinion.

## I.     BACKGROUND

On February 26, 2026, the court held an evidentiary hearing on Wilson's Motion to Suppress. *See* Min. Entry (Feb. 26, 2026); *see also* Hr'g Tr. at 1–2. It heard testimony from Officer Anthony DelBorrell, an eleven-year veteran of the Metropolitan Police Department ("MPD") who participated in the search and seizure of Keonte Wilson on August 28, 2025. *See* Hr'g Tr. at 10–11, 14, 17. That evening, DelBorrell was assigned to the "crime suppression federal task force" and was engaged in "proactive interdiction" patrols alongside other MPD officers and

agents from various federal law enforcement agencies. *Id.* at 12, 14–16. His testimony and the police body-worn camera footage establish the following:

At around 8:55 p.m. on August 28, 2025, Officer DelBorrell, three other MPD officers, and several federal agents were patrolling the 1400 block of V Street NW by car. *See* Hr'g Tr. at 14–16. There were three to four police vehicles and as many as ten officers and agents in the convoy. *Id.* at 60; *see also* Gov't Ex. 2 at 20:56:31–55 (Alarcon Footage) (appearing to show ten officers and agents, possibly more). The MPD officers were in full uniform, and the federal agents were wearing tactical vests with law enforcement identifiers. Hr'g Tr. at 16–17. Shortly after turning onto the 1400 block of V Street, the police stopped their cars upon noticing two groups congregating near each other on the public sidewalk. *Id.* at 24, 26. Although the officers had not observed anyone in either group engage in any suspicious behavior, the officers nevertheless exited their vehicles "[t]o make contact" and "to see" what "was going on." *Id.* at 30–31. The first group consisted of three men; the second group consisted of Wilson and a woman. *Id.* at 26–27.

Officer DelBorrell and MPD Officer Alarcon quickly approached Wilson and the woman, while MPD Officers Taher and Duckett quickly approached the group of three men. *See* Gov't Ex. 1 at 20:56:08–23 (DelBorrell Footage); Gov't Ex. 2 at 20:56:16–23 (Alarcon Footage); Gov't Ex. 3 at 20:56:03–40 (Taher Footage). The federal agents did not directly engage either group but stood nearby, providing back up and securing the perimeter.

At 8:56:09 p.m., Officer DelBorrell initiated contact with Wilson and the woman by shining his flashlight on the two and saying, "Hey, how y'all doing man?" Gov't Ex. 1 at 20:56:08–11. After exchanging brief pleasantries, DelBorrell bypassed the woman, moved closer to Wilson, continued shining his flashlight on him, and asked, "Got anything on you, dog?" *Id.* at 20:56:16–19. Wilson replied, "Nah, bro;" DelBorrell asked again, and Wilson repeated that he

did not; DelBorrell then asked for a third time, "Nothing?" *Id.* at 20:56:19–23. By this point in the exchange—at 8:56:21 p.m.—Wilson was surrounded on all four sides: There was a tall fence behind him, Officer DelBorrell a foot or two in front of him, Officer Alarcon standing about five or six feet to his right, and a federal agent about seven to eight feet to his left. *See id.* at 20:56:20–35; Gov't Ex. 2 at 20:56:20–35; *see also* Hr'g Tr. at 82–83. Wilson remained surrounded for the duration of the encounter, and all three officers shined their flashlights on Wilson before DelBorrell allegedly observed any bulge. *See* Gov't Ex. 2 at 20:56:21–20:56:53.

At 8:56:28 p.m., DelBorrell asked Wilson if he had anything in his backpack. See Gov't Ex. 1 at 20:56:27–29. Wilson said his laptop was inside and asked if DelBorrell wanted to see it— an offer which DelBorrell said he appreciated. *Id.* at 20:56:29–34. Wilson took his backpack off, unzipped it in front of his body, and removed his laptop from the bag. *Id.* at 20:56:31–40. DelBorrell testified that from this point forward, Wilson held his backpack in front of his waistband and that this unusual positioning was an indication that Wilson "may be carrying some contraband." Hr'g Tr. at 36–37. DelBorrell also testified, however, that before the backpack exchange, he had no reason to believe that Wilson was engaged in illegal activity. *Id.* at 35–36.[1]

After Wilson showed DelBorrell his backpack, DelBorrell shined his flashlight at Wilson's left pant pocket and asked, "Nothing in there, man?" Gov't Ex. 1 at 20:56:40–43. Wilson took out a wallet and a ski mask, and then went to take keys out from his right pant pocket. *Id.* at 20:56:43–56. At around 8:56:53 p.m., Wilson shifted his backpack from his left hand to his right hand and moved his backpack slightly away from his body; DelBorrell, meanwhile, focused his

---

[1] DelBorrell testified that Wilson had a "wide-eyed glare" and "started to look in both directions" when police initially approached, which DelBorrell claimed he regarded as somewhat suspicious. Hr'g Tr. at 47, 64. But DelBorrell apparently did not think this rose to the level of indicating that Wilson was engaged in criminal activity. *See id.* at 35–36.

flashlight on Wilson's groin area. *Id.* at 20:56:52–55. DelBorrell testified that at this moment—8:56:53 p.m.—he saw a bulge in Wilson's groin area which was "inconsistent with the human anatomy." Hr'g Tr. at 37–38.[2] At 8:56:56 p.m., DelBorrell began pointing at this area and asked, "Anything in there, right there, though?" Gov't Ex. 1 at 20:56:55–57. After some brief back and forth with Wilson, DelBorrell said, at 8:57:08 p.m., "Let me see something," and began to pat down the area. *Id.* at 20:57:07–10. At 8:57:15 p.m., DelBorrell shouted the code word for a firearm. *Id.* at 20:57:14–16. Wilson was arrested and a firearm was recovered from his groin area. *Id.* at 20:59:49–21:00:13.

In October 2025, a grand jury indicted Wilson on unlawful possession of a firearm and ammunition by a person convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). Indictment, ECF No. 12. Wilson now moves to suppress the firearm recovered from his person on August 28. *See* Def.'s Mot. to Suppress, ECF No. 24 ("Def.'s Mot."). He argues that he was seized without reasonable suspicion when officers surrounded him, at around 8:56:21 p.m. *Id.* at 4–5. The Government concedes that police did not have reasonable suspicion to stop Wilson until after Officer DelBorrell allegedly spotted a bulge at 8:56:53 p.m. *See* Hr'g Tr. at 94 (The Government: "I want to be clear, I don't believe the officer has reasonable suspicion to seize Mr. Wilson until he sees the bulge."). But the Government insists that Wilson was not seized until Officer DelBorrell said "Let me see something" at 8:57:08 p.m. *Id.* at 96–97.

---

[2] The parties dispute whether DelBorrell actually observed a bulge, but the court need not resolve this issue. Even assuming DelBorrell observed a bulge at 8:56:53 p.m., Wilson's Motion to Suppress still must be granted because Wilson was seized before this alleged observation and the Government concedes—and the court agrees—that police did not have reasonable suspicion before the bulge was allegedly observed. *See infra* Part III.

## II.    LEGAL STANDARDS

The Fourth Amendment protects the "right of the people to be secure in their persons . . . against unreasonable searches and seizures."  U.S. Const. amend. IV.  This "prohibition against unreasonable seizures requires that all seizures, even" brief ones known as *Terry* stops, "be founded upon reasonable, objective justification." *United States v. Gross*, 784 F.3d 784, 786 (D.C. Cir. 2015); *see also United States v. Abdus-Price*, 518 F.3d 926, 929 (D.C. Cir. 2008) (explaining that "a police officer may effect a brief seizure for investigative purposes—a *Terry* stop—if he has a reasonable suspicion . . . that criminal activity may be afoot" (cleaned up)).  "But not all interactions between police officers and citizens amount to a 'seizure' for Fourth Amendment purposes." *Gross*, 784 F.3d at 786.  For example, a "seizure does not occur simply because a police officer approaches an individual and asks a few questions," "as long as the police do not convey a message that compliance with their requests is required." *Id.* at 787 (quoting *Florida v. Bostick*, 501 U.S. 429, 434–35 (1991)).

Rather, a Fourth Amendment seizure occurs only "when physical force is used to restrain movement or when a person submits to an officer's 'show of authority.'" *United States v. Brodie*, 742 F.3d 1058, 1061 (D.C. Cir. 2014) (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)).  Police conduct amounts to a show of authority if it "'would have communicated to a reasonable person' . . . 'that he was not free to leave.'" *United States v. Delaney*, 955 F.3d 1077, 1081 (D.C. Cir. 2020) (first quoting *Bostick*, 501 U.S. at 437; and then quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).  "In making that determination, courts consider the totality of the circumstances." *Id.*  Relevant circumstances include the number of officers on the scene, whether they were in uniform, whether the suspect was touched or intimidated, whether his movements were restricted, and the language and tone of voice used by the officers. *Mendenhall*, 446 U.S. at

554; *see also United States v. Castle*, 825 F.3d 625, 632–33 (D.C. Cir. 2016). The defendant bears the burden of establishing that he was seized, while the Government bears the burden of demonstrating that any seizure was justified. *See Castle*, 825 F.3d at 633–34.

### III. DISCUSSION

Wilson was seized before Officer DelBorrell allegedly spotted a bulge. Because the Government concedes that police lacked reasonable suspicion before that observation, *see* Hr'g Tr. at 94, Wilson's seizure violated the Fourth Amendment. *See Delaney*, 955 F.3d at 1087. And because the Government offers no reason for why an exception to the exclusionary rule would apply, the gun recovered from Wilson's person as a result of the unlawful seizure must be suppressed. *Id.* at 1087–88; *see also United States v. Green*, 149 F.4th 733, 743 (D.C. Cir. 2025).

To begin, Wilson—who was not engaged in any sort of suspicious activity—was surrounded on all four sides at least thirty seconds before DelBorrell observed a bulge at 8:56:53 p.m. Specifically, by 8:56:21 p.m., DelBorrell stood one or two feet in front of Wilson, Officer Alarcon stood five or six feet to his right, a federal agent stood seven or eight feet to his left, and a tall fence blocked him from behind. *See supra* Section I. "Such restrictions on movement are highly suggestive of a stop," *Delaney*, 955 F.3d at 1083 (cleaned up), especially because the positioning of the fence and the three officers effectively "impede[d] [Wilson's] only means of egress from the sidewalk." *United States v. Bryant*, 111 F.4th 105, 110 (D.C. Cir. 2024); *see also* Wayne R. LaFave, Search & Seizure § 9.4(a) (6th ed. 2025) ("encircling the suspect by many officers" is suggestive of a seizure); *United States v. Villa-Gonzalez*, 623 F.3d 526, 533 (8th Cir. 2010) (three officers present at the scene "positioned . . . so as [to] limit" the defendants' "freedom of movement" was indicative of a seizure); *United States v. Carter*, No. 20-cr-05, 2020 WL 3893023, at *4 (D.D.C. July 10, 2020) (finding a seizure where "the officers . . . blocked [the

defendant's] path and prevented him from going about his business by positioning themselves in front of and behind him").  In the face of such significant restrictions on movement, a reasonable person would not think that he is free to leave.

In addition to the three uniformed officers who directly surrounded Wilson, there were many other uniformed officers and agents present at the scene.  Although "the presence of multiple officers does not automatically mean that a stop has occurred," "'the threatening presence of several officers'" is one of the relevant considerations in the show-of-authority analysis.  *United States v. Goddard*, 491 F.3d 457, 460–61 (D.C. Cir. 2007) (quoting *Mendenhall*, 446 U.S. at 554).  Indeed, the D.C. Circuit has described the presence of four officers as "suggestive of a stop," *id.* at 461, and here, there were as many as ten officers in total.  *See* Hr'g Tr. at 60; *see also* Gov't Ex. 2 at 20:56:31–55 (appearing to show ten officers and agents, possibly more).  Although the other officers and agents were either focused on the other group of three men or performing perimeter duties, *see* Gov't Ex. 2 at 20:56:31–55, the video footage shows that their overwhelming presence helped create a police-dominated atmosphere and blocked off the sidewalk to any other pedestrians, "ensuring that no other individuals interrupted the police interaction and preventing the [individuals being questioned] from leaving the vicinity."  *United States v. Black*, 707 F.3d 531, 538 (4th Cir. 2013).

Finally, it is notable that all three officers who directly surrounded Wilson shined their bright flashlights on him before DelBorrell spotted a bulge.  *See* Gov't Ex. 2 at 20:56:36–46.  Even if the use of bright flashlights is not precisely akin to the disorienting take down light in *Delaney*, *see* 955 F.3d at 1082, the use of flashlights by all three armed officers nevertheless indicated that Wilson was being "clearly target[ed]" by the police and thus "was not free to ignore their presence."  *See Bryant*, 111 F.4th at 110; *see also United States v. Young*, 707 F.3d 598, 603 (6th

Cir. 2012) ("The presence of three officers shining flashlights into the car and authoritative instructions from Officer Fannon also suggest that a reasonable person would not have felt free to leave anytime thereafter.").[3]  In sum, these circumstances—which all arose before DelBorrell allegedly saw a bulge—constituted a show of authority to which Wilson submitted by remaining put, answering questions, and unzipping his backpack. *See Delaney*, 955 F.3d at 1084–85; *see also Brendlin v. California*, 551 U.S. 249, 262 (2007) ("[O]ne sitting in a chair may submit to authority by not getting up to run away."); *United States v. Wood*, 981 F.2d 536, 540 (D.C. Cir. 1992) (individual submitted to police by not trying to flee).

The Government's arguments to the contrary are not persuasive.  It primarily contends that a reasonable person in Wilson's position would not have felt restricted by Officer Alarcon and the federal agent to Wilson's left because those officers were, at certain points, looking away from Wilson and not involved in DelBorrell's questioning. *See* Hr'g Tr. at 96; *see also* Gov't's Opp'n to Def.'s Mot. at 14–15, ECF No. 31.  Although it is true both Alarcon and the federal agent sometimes averted their gaze, both men remained in close proximity to Wilson from 8:56:21 p.m. onward, thus effectively blocking Wilson's only means of leaving the encounter. *See* Gov't Ex. 2 at 20:56:21–20:57:20.  It is clear, moreover, that both Alarcon and the federal agent were primarily focused on Wilson, as both men had focused their flashlights on him before DelBorrell allegedly spotted the bulge. *See id.* at 20:56:21–20:56:53.

The Government also emphasizes the conversational tone of the encounter and the fact that none of the officers drew their weapons.  Although these factors weigh in favor of the Government, they do not overcome the other factors—principally, the significant restrictions on Wilson's

---

[3]  Notably, the officers showed no interest in the woman who was with Wilson.  She was not similarly surrounded or questioned.  That she was free to walk away while Wilson was being clearly targeted and boxed in further indicates that Wilson had been seized.

freedom of movement and the overwhelming presence of many armed, uniformed officers. The Government somewhat overstates, moreover, the pleasantness of the interaction. While it is true that "questions alone . . . ordinarily do not amount to a 'show of authority,'" "the 'nature of a police officer's questions' can bear on whether a person has been seized." *Gross*, 784 F.3d at 788 (quoting *Gomez v. Turner*, 672 F.2d 134, 146 (D.C. Cir. 1982)). And although DelBorrell's tone of voice was conversational, his questioning was insistent and inquisitorial; he repeatedly asked Wilson whether he had anything on him, even after Wilson said he did not; repeatedly asked Wilson what was in his backpack; and then asked Wilson what was in his pockets, all before allegedly spotting the bulge. Such repeated questioning, which indicated DelBorrell's profound skepticism that Wilson was telling the truth, contributed to an atmosphere in which a reasonable person in Wilson's position would have felt he was being targeted by police on suspicion of a crime and was therefore not free to leave. *Cf. Gordon v. United States*, 120 A.3d 73, 78 (D.C. 2015). In short, Wilson, who was simply lawfully present on a public sidewalk on a summer evening, was seized before any bulge was spotted, in violation of the Fourth Amendment.

## IV.    CONCLUSION

For the foregoing reasons, the court will GRANT Wilson's Motion to Suppress. A separate order will follow this opinion.

Date: March 31, 2026

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge